# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:20CR00001 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **QUANTE LEON BOOKER,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Whitney D. Pierce, Assistant United States Attorney, Abingdon, Virginia, for United States; Juval O. Scott, Federal Public Defender, Charlottesville, Virginia, for Defendant.*

The defendant, Quante Leon Booker, charged with possessing a firearm as a prohibited person, has filed a motion to suppress evidence obtained during a warrantless purported *Terry*[1] stop. For the reasons stated hereafter, I will grant the motion in part and deny it in part.

## I.

The principal evidence presented in connection with the motion to suppress consist of a police officer's recorded bodycam video. The court received additional testimony from the two police officers involved given at a hearing on the motion.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

The facts surrounding the officers' detention of Mr. Booker, based primarily on the bodycam video, are as follows.

On September 10, 2019, police were dispatched to a public housing development in Bristol, Virginia, to respond to a domestic dispute. The domestic violence call was unrelated to Mr. Booker. The bodycam video begins with Officers Roberts and Krabbe talking to the female domestic complainant in a driveway near the entrance to the development. The officers begin walking the woman back to her apartment, and then the officer wearing the bodycam, Officer Krabbe, suddenly says, "Whoa. Did you see that rifle?" Officer Krabbe believed (correctly) that it was an AR-15 style rifle.[2] At that point, they are several apartment lengths away from a parking lot where seven cars are parked. On the far side of the lot, there is a blue car backed into a parking space with its hood up and a red car parked next to it in the opposite orientation, also with its hood up. Mr. Booker is seen opening the trunk of the red car and placing a rifle in the trunk. He is some distance from the officers, and the video gives no indication that he has noticed them. The time stamp on the video indicates that the time is 6:03 p.m., and the sun is shining.

---

[2] It turned out to be a Hi-Point brand nine-millimeter Model 995 semi-automatic rifle, an AR-15 style rifle, although the Hi-Point Model 995 is technically referred to as a carbine, since it has a shorter barrel length. Wikipedia, *Hi-Point Carbine*, https://en.wikipedia.org/wiki/Hi-Point_Carbine (last visited Apr. 12, 2021).

The officer tells the woman, "Go inside your apartment for me.  Or just, hide in there for a second."  The woman steps off to the side, and the two officers proceed toward the parking lot.  As Mr. Booker remains bent over the trunk for a few seconds, one of the officers says to the other, "He's hiding it."  With the trunk still open, Dalton Cross, who had been at the adjacent blue car, walks over to Booker, looks in the trunk, and appears to be talking to Mr. Booker.  The trunk is still open when one of the officers whistles and says, "Hey fellas."  Mr. Cross turns and looks at the officers, and then Mr. Booker does the same.  Officer Krabbe motions to the men and says, "Step away from the car for a minute."  Mr. Booker slowly shuts the trunk, and Officer Roberts says, "Don't shut it."

Mr. Booker turns toward Officer Roberts with his hands out in front of him, palms open.  Officer Roberts says, "I seen your gun, man.  Is that a BB gun or is that a real rifle?"  Mr. Booker replies, "That's not my gun," and Mr. Cross says, "That's my wife's."  The officer says to Mr. Booker, "You had it in your possession," to which Mr. Booker replies, "He asked me to put it in the trunk for him while he was putting some freon in the car."  Mr. Cross agrees, "That's all he was doing."  Mr. Cross shows the officers that he was working on the blue car.

Officer Krabbe calls dispatch on his radio and tells the dispatcher that they have a new case and to hold traffic for a minute.  He looks into the back seat of the red car.  As he turns back around, the video shows that Officer Roberts has Mr.

Booker and Mr. Cross standing in front of the open hood of the blue car with their backs to him and their hands up.  Officer Roberts says, "I didn't say you were under arrest, did I?  You're just under investigative detention."  Officer Roberts instructs Mr. Booker to just relax and put his hands on the car.  He asks Mr. Booker his name, which Mr. Booker supplies.  He asks Mr. Booker if he is a convicted felon.  Mr. Booker says, "No."

Mr. Booker, holding a cigarette, asks for a lighter.  The officer says, "Not right now, give me just a second."  The officer asks the men for their identification, and they provide their drivers licenses from their wallets to the officer, which he keeps.  Mr. Booker says, "I don't understand."  Officer Roberts states, "As long as you're good and you can possess a weapon, it's fine, but when we roll up here . . . ."  Mr. Booker then breaks in and says, "Possess it, I don't own it.  I don't have it."  Officer Roberts then says, "I understand that, but you was in possession at the time that we saw it.  That's why we . . . ."  Mr. Booker then states, "I thought it was a BB gun.  I mean, I didn't know it was a real gun."  Officer Roberts says, "It may be . . . but we saw it over here, and we gotta confirm it."  Parts of this conversation are inaudible over Officer Krabbe's call to dispatch.

Officer Krabbe then says to Mr. Booker, "But you're not a felon?," to which Mr. Booker responds, "No."  The officer states, "Then you got nothin' to worry about."  Mr. Booker says, "I mean, still, though, like that's just putting a gun

[inaudible]."  Officer Krabbe then gives the dispatcher Mr. Cross's information.  In the background, Officer Roberts can be heard stating, "We were here for another reason . . . we get here and we see a gun . . . so for our safety, we're making sure everybody's cool, can you legally possess a firearm, and then if everything's good, we can go back to hopefully what we were originally here for, okay?"  Mr. Booker says, "Alright," then again asks if he can smoke a cigarette to calm his nerves, saying, "My nerves are tore up."  Officer Krabbe asks if he has a lighter on him, and Mr. Booker says, "I just didn't expect . . ."  Officer Krabbe tells him that if he has a lighter on him, he can have a cigarette.  Mr. Cross tells the officers that he understands why they needed to investigate.  Officer Krabbe says, "I didn't expect to see a .223 rifle either."

Mr. Booker says, "[Mr. Cross] was putting freon in his car and he was using my freon and stuff, but mine, something's going on with my pipe, my . . ."  Officer Roberts then opens the trunk of the red car and Mr. Cross walks toward him.  Officer Krabbe says, "Come back over here, bud," and Mr. Cross backs away from the red car with his hands up.

While Officer Roberts searches the trunk, Officer Krabbe asks Mr. Cross, "And so you technically own it, right?" to which Mr. Cross replies, "No, it's my wife's."  He then adds, "It's her car."  Mr. Booker asks Mr. Cross, "So is it real?" and Mr. Cross nods his head.  Mr. Booker exclaims, "Damn!"  "It's a nine

millimeter, .995, is what it is," explains Mr. Cross.  Mr. Booker says, "That's crazy!

I thought it was a damn BB gun."  Officer Krabbe and Mr. Cross then discuss when

and how Mr. Cross and his wife obtained the gun.  Mr. Booker remarks again, "I

thought it was a [expletive] BB gun," to which Mr. Cross responds, "No, bro," and

Mr. Booker says, "Golly."

Officer Krabbe asks dispatch to check whether Mr. Booker has any felonies

on his record.  Officer Roberts then asks the men if there are any guns in either

vehicle.  The men both respond, "No, sir," and the officer says that for their safety,

they need to do a weapons search of both vehicles.  He asks about the magazine for

the gun in the trunk of the red car, and Mr. Cross says it is not in there.  Officer

Krabbe then says to Mr. Booker, "Now I know there was 'cause you pulled one out.

There was a magazine that —"  and Mr. Booker replies, "No there was no mag —

there was like, I didn't even know, I thought it was a BB gun, I didn't know if it'd

take a magazine or what."  Officer Krabbe says, "I saw you holding somethin' that

looked like a magazine," and Mr. Booker says, "No, that was the handle thing, the

— her — handle switcher.  That's what he said it was."  The officer says, "Oh,

okay."  Mr. Cross explains that he took his wife to the target range and she put the

gun and ammunition in the car afterward.  He says he does not carry the clip and

does not allow his wife to carry the clip either.

Mr. Booker asks Officer Krabbe if the officer could grab his water from the car, stating that he is dehydrated.  The officer responds, "Hold tight for me, brother, okay?"  Mr. Booker says that he wants to go into the air conditioning.  The officer says, "Hopefully this won't take long, as long as neither one of y'all got — so as long as you guys don't have no felonies, either one of ya, or I'm sorry, convicted felon, neither one of y'all, the gun's not stolen, we don't plan on taking much more of y'all's time."  Mr. Cross says, "You're fine, sir," and Mr. Booker says, "I didn't, I — like I said, I thought it was a damn BB gun. I don't — I've never seen a [expletive] gun like that."

Officer Roberts says, "My question is, why would you lay it in here and cover it up with all that [expletive]?" to which Mr. Booker responds, "Because, 'cause it was laying on there odd, I didn't want something to break it somehow, or what." Mr. Cross chimes in to say, "That sight though is brand new and it gets scratched up, and that's why we usually set it on cloth." He goes on to say, "Nothing special but, it was somethin' for home defense, we had people shootin' at us and stuff, whenever we lived over there, we moved back to Old Stage Trail . . . ." Mr. Booker breaks in with, "Us as in him — I've lived here for five years." Officer Krabbe laughs and says, "I got you.  You say don't couple you in that, right?"  Mr. Booker then explains that he stays away from things like that and his little girl turns a year

old next month, to which the officer replies, "I understand."  Additional conversation ensues as Officer Roberts continues to search the red car.

Mr. Booker turns to Officer Krabbe and says, "You probably came up here the night my mom got shot."  The officer says he was not there, and Mr. Booker says he forgot who that officer was, and then mentions a time when his bike was stolen. At one point, Mr. Booker asks if it is okay for him to position his arms in a certain way, and he explains that he tends to get nervous around police.  Officer Roberts then proceeds to search the blue car, which Mr. Booker says belongs to his fiancé. Mr. Cross later asks for a cigarette and tells the officers they had scared him.  Officer Krabbe then states, "That's the problem man, you guys might be 100% law-abiding citizens or, you might have just bought a gun and about to just shoot it up."  Mr. Cross says that he understands and the officers are not violating his rights.  Mr. Booker says that his fiancé took his car to Myrtle Beach, and Officer Roberts says again that as long as neither man is a convicted felon and the gun is not stolen, the officers will be on their way.

The officer says, "When we roll up here on a domestic situation, we don't know exactly who we're looking for —" and Mr. Booker interrupts to ask, "Did y'all even get to check it out yet?"  The officer says, "We're gettin' there."  Mr. Booker says, "I didn't even see you," and Officer Krabbe says, "Well that's good.  It looked — from back there it looked like an AR.  But I couldn't get a good look at it."  Mr.

Booker tells the officers that close to ten years ago, his cousin sent him a picture of a gun that looked just like the one in the trunk, but it was a BB gun. "That's why I thought it was a BB gun," he says. He says that since his mom was shot, he stays away from guns.

The officer goes into the blue car to retrieve a bottle of water for Mr. Booker and receives a call from dispatch. The woman on the radio tells the officer that she just got off the phone with Mr. Booker's probation officer, who said that Mr. Booker has a felony, but it is not showing up on the criminal history report. Mr. Booker can then be heard in the background telling Officer Roberts that he is on probation for perjury. He tells the officers, "I'm just trying to be honest with you, I don't know if it's a misdemeanor or a felony. I don't know what it classifies as." He then says, "I know I got probation till February, February third." After a moment, Officer Roberts asks, "So what was the situation with the perjury stuff? 'Cause perjury's a felony." Mr. Booker responds, "Is it?" and the officer says, "Yeah." Mr. Booker says, "I didn't know that." Mr. Booker then asks if he's going to be arrested, and the officer says he probably is. The officer tells Mr. Booker that a convicted felon cannot possess or even touch a firearm. Mr. Booker reiterates that he does not own a firearm and that he thought it was a BB gun. He asks if there is any way the officers can give him a break.

Mr. Cross apologizes for putting Mr. Booker in that situation and tells the officers that Mr. Booker really does just try to keep to himself and take care of his daughter. The two men and the officers engage in several more minutes of conversation. Officer Krabbe receives a phone call from Mr. Booker's probation officer, who apparently confirms that Mr. Booker had previously been convicted of a felony, although only one side of the conversation can be heard on the video. The men talked a bit more, and then the officers arrested Mr. Booker and seized the firearm.

Mr. Booker, it must be noted, is African American, while the officers and Mr. Cross are all Caucasian. The video shows Mr. Booker shirtless, with numerous tattoos on his torso and arms, and his hair in dreadlocks. The interactions among the men could be described as cordial; neither Mr. Booker nor Mr. Cross exhibit any antagonistic or aggressive behavior.

Mr. Booker in fact had pled guilty in 2016 to a federal charge of making false statements in connection with a firearms investigation. He had been sentenced to six months imprisonment followed by three years of supervised release, and he was still under supervision at the time of the incident in question. Sometime after the events of September 10, Mr. Booker reported to his probation officer (as he was required to do) that he had been arrested and he admitted to the probation officer that he had possessed the rifle. A grand jury of this court indicted him on a charge of

possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), for which he is awaiting trial.

Mr. Booker contends that the police officers did not have reasonable suspicion to justify detaining him. He has moved to suppress the firearm and all statements obtained from him during his detention, as well as his later admission to his probation officer. Mot. to Suppress 10, ECF No. 25. The issues have been fully briefed and orally argued and are ripe for decision.

## II.

The Fourth Amendment to the United States Constitution generally prohibits unreasonable searches and seizures. The Fourteenth Amendment incorporates this right and makes it enforceable against the states. *Mapp v. Ohio*, 367 U.S. 643, 660 (1961). As the Fourth Circuit recently reminded us,

> [O]ur law does not permit law enforcement officers to roam around and constrain people without justification. A country defined by such suspicionless seizures would be a police state with all the citizen mistrust and unrest attendant thereto. The rules thus give Americans security and protect them from being arbitrarily targeted by the authorities.

*Varner v. Roane*, 981 F.3d 288, 292 (4th Cir. 2020).

Nevertheless, a law enforcement officer may temporarily seize and detain a citizen without violating the Fourth Amendment when the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *United States v. Black*, 525 F.3d 359, 364 (4th Cir.

2008) (quoting *Terry*, 392 U.S. at 30).[3]  This reasonable suspicion standard requires a showing of proof that is "considerably less than a preponderance of the evidence." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).  "[A] police officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.*  Reasonable suspicion is based on the circumstances and "cumulative information available to the officer," and it is evaluated objectively, "not on the officer's actual state of mind at the time the challenged action was taken." *Id.* at 337.  "[T]he government has the burden of proof in justifying a warrantless search or seizure . . . ."  *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020).

The Virginia legislature has chosen to permit the open possession of firearms, including AR-15 style rifles.  Thus,  possession of a firearm like the one Mr. Booker placed in the trunk of the red car is not illegal in Virginia.  As Officers Krabbe and Roberts repeatedly stated during their interaction with Mr. Booker and Mr. Cross, possession of the weapon would only have been illegal if one of the men were a convicted felon or if the gun had been stolen.  The Fourth Circuit has squarely addressed this issue:

---

[3]  I have omitted internal quotation marks, alterations, and citations throughout this opinion unless otherwise noted.

> Being a felon in possession of a firearm is not the default status. More importantly, where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states.

*United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013). Moreover, "[t]here is no 'automatic firearm exception' to the *Terry* rule." *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015); *see also Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The government asserts that the officers here had reasonable, articulable suspicion to stop Mr. Booker and Mr. Cross based on the following: (1) the officers were responding to a domestic disturbance complaint that involved physical violence, and they claim they did not know whether Mr. Booker was involved in that disturbance; (2) they encountered Mr. Booker and Mr. Cross in a high-crime area; (3) the firearm they saw was an uncased, all black, military-style rifle, which they say was unusual; (4) they saw Mr. Booker cover the gun with other items and assumed he was hiding it, despite that he was apparently unaware that the officers were present; and (5) after they directed him to step away from the car, Mr. Booker closed the trunk.

I find that the officers did not have reasonable suspicion to detain Mr. Booker. It is clear from the bodycam video that the reason they stopped the men was because they saw Mr. Booker briefly holding the firearm and placing it in the trunk of the

car.  Had Mr. Booker not been a convicted felon — a status the officers did not know at the time — his possession of this firearm would have been entirely legal.  *See United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005) (stating the clear rule that "an illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped").  Even though the gun was an AR-15 style rifle as Officer Krabbe suspected, a law-abiding citizen had a right to openly possess it.  It was clear that the men were making mechanical repairs to their cars in the parking lot of an apartment complex in broad daylight.  *Cf. Wingate v. Fulford*, 987 F.3d 299, 306 (4th Cir. 2021) (finding that a car parked with its hood up "indicates a very specific, non-criminal enterprise: attempting to identify and remedy car problems").  There was nothing suspicious about what the officers observed that would have led a reasonable officer to believe that a crime was imminent or in progress.

While I appreciate the officers' view that domestic disputes have the potential to be particularly volatile, I find that a reasonable officer would not have believed Mr. Booker was involved in the domestic dispute for which they were called to the apartment complex.  Both officers testified that they did not ask the complainant whether Mr. Booker was the boyfriend about whom she had complained.  She did not indicate to the officers that she knew Mr. Booker or otherwise raise any concern about him.  He was also located 30–40 yards away from them, so a reasonable officer would not have perceived any immediate threat.

-14-

That the public housing development was allegedly a high crime area did not give the officers license to stop the men.  First, the government did not offer convincing evidence that this apartment complex was a high crime area.  Even if it was, however, I would not give great weight to that factor.  "Courts may consider whether a person is in a 'high crime area,' but simply being in an area where crime is prevalent is minimally probative in the reasonable suspicion analysis." *Wingate*, 987 F.3d at 306.   Public housing complexes like the one where Mr. Booker was stopped often have a higher incidence of crime than more affluent areas, but that fact alone cannot be used to justify targeting the low-income and minority people who disproportionately reside in those developments.  *See Black*, 707 F.3d at 542. Affording this factor any special weight in the reasonable suspicion analysis "would deem residents of . . . [a] high crime area . . . less worthy of Fourth Amendment protection by making them more susceptible to search and seizure by virtue of where they live." *Curry*, 965 F.3d at 331.  The Fourth Circuit has "emphatically reject[ed]" that approach, which would risk "treating members of our communities as second-class citizens." *Id.*

Booker's act of closing the trunk before turning toward the officers ensured that he could not readily access the firearm.  After Mr. Booker closed the trunk, it was clear to the officers that he was not armed.  Prior to that point, the officers had not directed him to leave the trunk open.  The simple act of closing the trunk of a car

after placing a gun in the trunk cannot reasonably be considered suspicious, even considering that the officers previously witnessed Mr. Booker placing cloth over and around the gun.

I have considered each of the facts identified by the government individually and collectively, and I find that they do not establish reasonable suspicion for the stop either on their own or in combination with one another. This is "yet another situation where the Government attempts to meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion." *Black*, 707 F.3d at 539. The officers' warrantless seizure of Mr. Booker violated the Fourth Amendment.

At the motion hearing, Officer Roberts further testified that he found it suspicious that Mr. Booker answered, "That's not my gun" when asked whether the gun was real or a BB gun. The officer testified that he thought Mr. Booker was evading his question. The government contends that this statement can be used in assessing whether there was reasonable suspicion for the *Terry* stop because in its view, Mr. Booker was not seized until Officer Roberts told him he was under investigative detention.

I disagree. For purposes of the Fourth Amendment, a seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Foster*, 824

F.3d 84, 88 (4th Cir. 2016).  While the officers did not apply or threaten force when they initially approached Booker, I find that a reasonable person being ordered by two uniformed police officers to "step away from the car" would not have felt free to terminate that interaction and leave.  The seizure thus occurred when the officers commanded the men to step away from the car.  A *Terry* stop must be "justified at its inception." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020).  I conclude that the officers had already seized Mr. Booker at the time he told Officer Roberts that the gun was not his, and that response therefore cannot be considered in analyzing whether the officers had reasonable suspicion to make the stop.[4]

Evidence gained either directly or derivatively from an unlawful seizure or search is not admissible in a criminal prosecution at trial unless the evidence is also derivable from an independent source distinct from the unlawful seizure or search and its yields.  *See Segura v. United States*, 468 U.S. 796, 804–05 (1984); *Nardone v. United States*, 308 U.S. 338, 340–41 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).  A source is sufficiently independent if its connection to the unlawful search has "become so attenuated as to dissipate the taint" of unlawfulness from the evidence.  *Nardone*, 308 U.S. at 341; *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Costello v. United States*, 365 U.S. 265,

---

[4]  Further, I am unconvinced that there was anything suspicious about Booker's response to the officer's question.

280 (1961).  Although the government ought not to be advantaged by the availability and use of evidence that was attained in violation of constitutional guarantees, it also should not be placed in a more disadvantaged position than that in which it would have been had the illegal conduct not occurred.  *See Murray v. United States*, 487 U.S. 533, 542 (1988).  Thus, proposed evidence is to be inadmissible only if it meets a threshold "but for" test, under which suppression depends on whether the unlawful search was the "but for" cause of the discovery of the evidence.  *Segura*, 468 U.S. at 815.  Once an unlawful seizure or search occurs, the burden of proof rests with the government to show that the evidence whose admission is sought is not the fruit, either direct or indirect, of the unlawful seizure or search and instead derives from an independent source.  *See United States v. Jeffers*, 342 U.S. 48, 51 (1951).

There is no question that Booker's statements and actions shown on the video would not have occurred had the officers not improperly detained him.  Any statements Mr. Booker made during his interaction with the officers are inadmissible.  The government has also conceded that Mr. Booker's later statement to his probation officer was a direct result of the *Terry* stop.  That statement will also be excluded from evidence.  What the officers saw before they stopped Mr. Booker, however, is not the fruit of the unlawful seizure and is admissible.  *See United States v. Crews*, 445 U.S. 463, 475 (1980) ("The exclusionary rule enjoins the Government

from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.").

The defendant contends that the firearm itself must be excluded as the fruit of the unlawful seizure and subsequent search of the red car. The government responds that Mr. Booker cannot challenge the search of the red car because it was not his car, he was neither a driver nor a passenger of the car, and he had no reasonable expectation of privacy in it. *See Rakas v. Illinois*, 439 U.S. 128, 148–49 (1978) (holding that persons who assert neither a property nor a possessory interest in automobile searched or property seized have no legitimate expectation of privacy subject to Fourth Amendment protection). I agree with the government that the physical firearm is admissible.

The firearm itself is not fruit of the unlawful seizure because nothing occurred during the illegal detention of Mr. Booker that led to the search. The officers had already witnessed Mr. Booker placing the firearm in the trunk of the red car before they stopped him. Even if they had not detained Mr. Booker, the officers almost certainly would have proceeded to search the vehicle. They stated twice that they were searching the car for their safety. They did not decide to search the car based on anything Mr. Booker said or did after they detained him. Indeed, they did not learn of his status as a felon until after they had searched the vehicle and recovered the firearm. Because the exclusionary rule is not intended to put the government in

a worse position that it would have been in absent the unlawful seizure, I conclude that the firearm itself should not be suppressed.

III.

For the foregoing reasons, it is **ORDERED** that the Motion to Suppress, ECF No. 25, is GRANTED IN PART and DENIED IN PART.  The court suppresses any statements made by the defendant during his interaction with the officers, as well as any statements he made to his probation officer after his arrest. The court declines to suppress the firearm retrieved from the search of the red car.

ENTER:  April 12, 2021

/s/  JAMES P. JONES
United States District Judge